**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Christine M. Arguello**

Civil Action No. 07-cv-01146-CMA-BNB

JAMES RIVER INSURANCE COMPANY, an Ohio corporation,

      Plaintiff,

v.

RAPID FUNDING, LLC, a Colorado Limited Liability Company,

      Defendant.

---

## ORDER GRANTING PLAINTIFF'S MOTION TO
## EXCLUDE TESTIMONY OF ANDREW MILLER

---

      This Matter is before the Court on Plaintiff James River Insurance Company's ("James River") Motion to Exclude Expert Testimony of Andrew Miller (Doc. # 72). The Court held a Rule 104 Hearing on February 13, 2009.

## <u>FACTS</u>

      This is an insurance coverage dispute. The parties agree on many of the relevant facts, which the Court will briefly recap. James River is an excess and surplus insurer. Among other things, James River insures vacant buildings. It operates under the motto, "an unrelenting focus on underwriting profit." Defendant Rapid Funding, LLC ("Rapid Funding") provides loans to property developers and owners. Rapid Funding occasionally ends up owning the properties for which it has provided funding.

      Rapid Funding used Lockton-Chicago, a subsidiary of one of the largest insurance brokers in the world, to procure insurance for some of its properties.

With Lockton-Chicago acting as broker, Rapid Funding took out Commercial Property Policy, No. 00019308 (the "Policy") from James River on October 12, 2006.  Rapid Funding had previously used James River for general liability insurance, but the parties had no direct communication with each other regarding the Policy until they signed the insurance contract.  Rapid Funding did not research James River prior to buying the Policy, but apparently liked James River's terms because it accepted the Policy less than an hour and a half after receiving James River's quote.  The Policy lasted six months, cost Rapid Funding $32,500 and covered seven different properties in multiple states.

One of the properties covered under the Policy was an apartment complex in Wyoming, Michigan, the 38-year-old Amsterdam Gardens ("the Gardens").  The Gardens consisted of two vacant apartment buildings and a clubhouse, all which the City of Wyoming had condemned and forcibly evacuated in 2003.  Rapid Funding did not own the Gardens when it took out the Policy, but it purchased the apartment complex two weeks later at a foreclosure sale on October 25, 2006.[1]  Under the Policy, Rapid Funding could recover up to $3 million for a loss to the Gardens.

Three months later, on January 24, 2007, a fire completely destroyed the North Building at Amsterdam Gardens.  James River began investigating the fire and, for reasons that are not clear, cancelled the Policy one week after the fire.

---

[1]  Thus, the policy period pre-dated Rapid Funding's ownership of the Amsterdam Gardens.

The investigation continued and James River sent Rapid Funding two separate reservation of rights letters.  On March 23, 2007, Rapid Funding submitted its first "Statement in Support of Proof of Loss" under the Policy, in which it contended that it was entitled to policy limits.  James River rejected the first Proof of Loss because it did not contain certain technical details, but allowed Rapid Funding to submit an amended Statement, which it did on May 3, 2007.  James River accepted Rapid Funding's second Statement in Support of Proof of Loss, but denied Rapid Funding's request for policy limits on the merits of the claim.

The parties agree that the fire – suspected arson – was a covered loss under the Policy.  They also agree that the fire rendered the North Building completely worthless.  However, the genesis of this lawsuit is a vigorous dispute regarding the pre-fire value of the North Building, which would determine the amount, if any, James River owes Rapid Funding under the Policy.

Although James River insured the building for up to $3 million under the Policy only a couple of months before it burned, James River claims the North Building was worthless before the fire.  James River's valuation rests on the opinion of an appraiser it hired immediately after the fire, John A. Meyer.  Mr. Meyer, a residential appraiser by training and trade, concluded that the North Building had a negative (*i.e.*, less than zero) pre-fire value because it was older, condemned and uninhabitable.  This valuation theory leads James River to conclude that it owes Rapid Funding nothing more than the

$200,000 it has already paid under the terms of the Policy for demolition and fire department charges.

Rapid Funding contends the North Building was worth $4,489,731, which, Rapid Funding argues, entitles it to policy limits. Rapid Funding relies primarily on the opinion of its owner, Andrew Miller, who performed his own calculations to arrive at the much higher pre-fire value. Mr. Miller reached this valuation, which Rapid Funding calls the "actual cash value," by calculating the replacement value of the North Building, $7,145,093, and subtracting 40 percent for depreciation, which results in the $4,489,731 number. Mr. Miller reaches his opinion despite the fact that Rapid Funding had paid only $1.8 million for the entire Amsterdam Gardens complex, which included three buildings and almost ten acres of land.

Thrown into this valuation mix was a third-party buyer Rapid Funding had lined up. The buyer was apparently willing to purchase the entire Amsterdam Gardens complex for $1.8 million and the sale was pending at the time of the fire. The sale fell through after the fire and Rapid Funding donated the property to a local school. Although both parties attempt to use the existence of this third-party offer to bolster their respective positions, neither party claims that $1.8 million constitutes a reasonable pre-fire value of the North Building.

## PROCEDURAL HISTORY

In the contretemps that ensued over coverage after the fire, James River continued to maintain the pre-fire value was zero and Rapid Funding stood by its policy

limits argument.  In May 2007, James River won the race to the court house by filing a declaratory judgment complaint (Doc. # 1).  James River sought a declaration that the North Building had a value of zero or less than zero prior to the fire and that its liability under the Policy was accordingly limited.  Rapid Funding contested James River's allegations and responded with counterclaims alleging that James River breached the terms of the Policy, breached the duty of good faith and fair dealing inherent to the Policy, and violated the Colorado Consumer Protection Act.

Discovery did little to change the parties' respective positions and on September 12, 2008, James River filed two Motions for Summary Judgment seeking dismissal of each of Rapid Funding's counterclaims (Doc. ## 70 & 71).  Concurrent with its Motions for Summary Judgment, James River also filed the instant Motion seeking to exclude all testimony of Mr. Miller based on *Daubert v. Merrell Dow Pharmas., Inc.*, 509 U.S. 579 (1993), and its progeny (Doc. # 72).  The end goal of James River's *Daubert* Motion appears to be to leave Rapid Funding without any evidence of pre-fire value of the North Building and thereby bolster its own valuation arguments on summary judgment.  The Motions for Summary Judgment have not stifled the parties' legal wrangling.  After the parties completed briefing on the Motions for Summary Judgment and *Daubert* motion, Rapid Funding amended its counterclaims to include a request for statutory "double damages" (Doc. # 103).  James River has moved to dismiss the Amended Counterclaim (Doc. # 112).  For the reasons explained below, the Court will

grant the *Daubert* motion and exclude Mr. Miller's evidence, the Motions for Summary

Judgment and Motion to Dismiss will be addressed separately.

<u>**ANALYSIS OF JAMES RIVER'S *DAUBERT* MOTION**</u>

James River wages a two-pronged attack on the admissibility of Mr. Miller's

valuation opinion.  First, James River argues that Mr. Miller is not qualified to offer his

valuation opinions because he is not a property appraiser by education, training,

licensure, experience, or otherwise.  It further argues that, even if qualified, this Court

should exclude his testimony because his methods are too unreliable to meet the

standards established by *Daubert, Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137

(1999) and *General Elec. Co. v. Joiner*, 522 U.S. 136 (1997).  Rapid Funding responds

with the rather curious arguments that *Daubert* is totally inapposite, state law should

supply the rules of admissibility and, in any event, Mr. Miller need not be a licensed or

trained appraiser in order to offer expert testimony on the value of property that he

owns.

Neither party gets it completely right.  On one hand, James River contends that

Mr. Miller must jump through an impermissibly narrow hoop before he can be qualified

as an expert for purposes of rendering an opinion on the pre-fire value of the North

Building.  On the other hand, this case *is* governed by the Federal Rules of Evidence,

so *Daubert* does apply and Rapid Funding misreads a non-binding Tenth Circuit opinion

regarding admissibility of expert evidence.  Given that the Federal Rules of Evidence

and *Daubert* govern this case, the Court must also review Mr. Miller's methodology to

determine whether it is reliable enough to present to a jury. It is on this element, specifically Rule 702's requirement that Mr. Miller base his opinion on sufficient facts and data, that James River and Mr. Miller run into an insurmountable obstacle.

## I. THE COURT'S ROLE REGARDING EXPERT TESTIMONY UNDER THE FEDERAL RULES OF EVIDENCE AND *DAUBERT*

### A. Rejection of the General Acceptance Test.

A little history will help explain the Court's role in addressing a challenge to expert opinion evidence under the Federal Rules of Evidence and the *Daubert* line of cases. Prior to *Daubert*, expert opinion evidence was admissible only if the principles upon which it was based had obtained "general acceptance in the field to which it belongs." *Daubert*, 509 U.S. at 583 (quoting the *Daubert* trial court); *see also Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923). The "general acceptance" test reflected judicial skepticism of opinion evidence that was inherent in the common law. *Daubert*, 509 U.S. at 586. However, as the pace of scientific discovery sped up and attitudes toward opinion evidence relaxed, this rigid posture began to change.

The Supreme Court recognized that, by adopting the Federal Rules of Evidence, Congress signaled a geologic shift towards a broader acceptance of expert opinion testimony in the courtroom. *Id.* at 588-89. The Court clarified that the Federal Rules of Evidence "occupy the field" in federal courts. *See United States v. Abel*, 469 U.S. 45, 49 (1984). But, until *Daubert* forced their hand, most federal courts did not catch up to the more accepting attitude regarding expert opinion evidence Congress had promulgated in the Federal Rules of Evidence. *Id.* at 586 n.3 (noting that general

acceptance test continued to be followed by the majority of courts even after adoption of the Federal Rules of Evidence).

Faced with a challenge to the viability of the general acceptance test some twenty years after adoption of Federal Rule of Evidence 702, the Supreme Court found that the "rigid general acceptance requirement would be at odds with liberal thrust of the Federal Rules and their general approach of relaxing the traditional barriers to opinion testimony." *Daubert*, 509 U.S. at 588-89 (internal citations and quotations omitted). Justice Blackmun reasoned that, because the Rules of Evidence occupy the field and because Rule 702 spoke directly to the admissibility of expert opinion evidence, Rule 702, not the common law general acceptance test, governed expert opinions. Specifically, Justice Blackmun held, "That austere standard, absent from, and incompatible with, the Federal Rules of Evidence, should not be applied in federal trials." *Id.* After *Daubert*, the general acceptance test was relegated from dispositive to just another factor to consider in examining an expert's methods and application. Subsequent decisions clarified that the *Daubert* admissibility analysis extended to all expert opinion testimony proffered under Rule 702, not just to "scientific evidence." *See Kumho*, 529 U.S. at 148-53.

## B.    The Post-*Daubert* Test for Expert Opinion

The Supreme Court has clarified that Fed. R. Evid. 702 works in conjunction with other Federal evidentiary rules (*e.g.,* 104 and 401) to set the groundwork for admissibility of expert opinions. *Daubert*, 509 U.S. 588-89. In *Daubert* parlance,

the trial court must act as a "gatekeeper" by reviewing a proffered expert opinion for relevance (Rule 401) and reliability as determined by compliance with the elements of Rule 702. *See generally Daubert*, 509 U.S. at 589-95 (describing role of trial courts in reviewing expert testimony under Fed. R. Evid. 702); *see also Goebel v. Denver & Rio Grande W. R.R. Co.*, 215 F.3d 1083, 1087 (10th Cir. 2000). A trial court has discretion to determine both how to examine an expert's qualifications and how to determine the expert's reliability under Fed. R. Evid. 702 . *Goebel*, 214 F.3d at 1087; *United States v. Velarde*, 214 F.3d 1204, 1208-09 (10th Cir. 2000). But, trial courts have no discretion to avoid, altogether, performing these gatekeeper functions. *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1223 (10th Cir. 2003). If a party challenges an adversary's expert witness opinion, part of the trial court's gatekeeping function is to sufficiently develop the record to allow an appellate court to determine whether the trial court properly applied the relevant law. *Goebel*, 214 F.3d at 1087. "By conducting a preliminary inquiry into the expert's qualifications and the admissibility of proffered evidence, a district court fulfills its initial obligation under Fed. R. Evid. 104(a)." *Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1233 (10th Cir. 2004). The trial court should bear in mind that it is the proponent of the expert who shoulders the burden to demonstrate admissibility by a preponderance of the evidence. *See Mitchell v. Gencorp., Inc.*, 165 F.3d 778, 781-82 (10th Cir. 1999); *United States v. Crabbe*, F. Supp. 2d 1217, 1220-21 (D. Colo. 2008); Fed. R. Evid. 702 advisory comm. notes.

Turning to the facts of this case, James River does not question the relevancy of Mr. Miller's opinion. Thus, the Court is first left to decide whether Mr. Miller is qualified to testify as an expert on the basis of the his "knowledge, skill, experience, training, or education" in the field of property valuation. Fed. R. Evid. 702; *see also Vail Assocs., Inc. v. Vend-Tel-Co., Ltd.*, 516 F.3d 853, 868 n.13 (10th Cir. 2008). Second, the Court must assess the reasoning and methodology underlying Mr. Miller's opinion and determine whether they are scientifically valid in the field of property valuation and applicable to the dispute at hand. *103 Investors I, L.P. v. Square D. Co.*, 470 F.3d 985, 990 (10th Cir. 2006); *Goebel*, 215 F.3d at 1087. This includes the critical question of whether Mr. Miller's opinion is based on sufficient facts and data so as to render it a reliable opinion. *See Goebel*, 215 F.3d at 1088.

## II.     MR. MILLER'S QUALIFICATIONS UNDER FED. R. EVID. 702

James River argues that Mr. Miller, unlike James River's valuation expert, is not a real estate appraiser and, therefore, is not qualified to opine on the pre-fire value of the North Building. However, James River cannot overcome the fact that Mr. Miller is not a typical fact witness with a tenuous connection to the North Building – he owns the North Building and has visited the property on at least one occasion.

### A.     Property Owners Can Testify Regarding Property Value Without Additional Qualifications.

It is well established that property owners are qualified to testify as experts on the value of property they own. *See Hornick v. Boyce*, 2008 WL 2329550, **4 (10th Cir. June 6, 2008) (collecting cases from the First and Fifth Circuits and holding that real

property owners may give expert testimony regarding the value of property they own);

*see also* 32 C.J.S. *Evidence* § 901 (2008) ("Generally a person engaged in a business

. . . which requires knowledge of real estate values is a competent witness as to the

value of land with which he or she is familiar."). Qualification is typically based on the

owner's unique connection to his or her property, although that connection need not be

substantial. *See Hornick*, 2008 WL 2329550 at **4; *In re Tamen*, 22 F.3d 199, 206

(9th Cir. 1994) (plaintiff's "status as prior general partner and then co-developer of the

properties" entitled him to be qualified as an expert on property values). Contrary to

James River's arguments, this presumption applies even in light of *Daubert*'s updated

expert standards of admissibility. *See, e.g., Loughride v. Chiles Power Sup. Co., Inc.*,

431 F.3d 1268, 1281 (10th Cir. 2005) ("Mr. Holzwarth, as the twelve-year owner of the

home since it was built, was qualified to testify regarding its value."); *Malloy v.

Monahan*, 73 F.3d 1012, 1016 (10th Cir. 1996) ("As owner of the houses, Malloy

was qualified to testify regarding their value because of his special knowledge of the

properties."); *In re Tamen*, 29 F.3d at 206.[2] None of these cases mention any sort of

"owner-plus" requirement like that sought by James River. Perhaps Mr. Miller is not

an intimately involved property owner, but established precedent does not require so

much. *See Malloy*, 73 F.3d at 1016; *In re Tamen*, 22 F.3d at 206.

---

[2] The Court also notes that Rapid Funding's assertion that *Daubert* does not apply to
the determination the admissibility of Mr. Miller's testimony is incorrect. *See Hornick*, 2008 WL
at *4 & n.3 (noting that state law may affect certain evidentiary decisions in federal courts, but
the Federal Rules of Evidence still apply to "threshold evidentiary issues concerning the
admissibility of . . . expert opinion[s]").

James River has not cited any cases that support of its claim that Mr. Miller should not be qualified to testify regarding real property values unless he is a licensed, trained, certified, card-carrying appraiser.  Mr. Miller's lack of appraisal education or training might affect the weight the fact finder should give his testimony but it does not foreclose his qualification under the Rules of Evidence in this case.  Additionally, James River's bright-line rule that all real estate property valuation experts must be licensed appraisers would contradict the flexible approach to the analysis of expert testimony that the Supreme Court adopted in *Daubert*.  *See, e.g., Daubert*, 509 U.S. at 594 ("The inquiry envisioned by Rule 702 is, we emphasize, a flexible one.").  If this Court accepted James River's invitation and held that only licensed and/or trained appraisers can qualify as experts regarding property values, the Court would be returning to the rigid "generally accepted" test that the Supreme Court rejected.  This Court is unwilling to make that trip back in time.

### B.    Mr. Miller's Additional Qualifications

Moreover, Mr. Miller is not a babe in the real estate woods.  Although not well-versed in the vagaries of the vacant property market in Wyoming, Michigan, he possesses enough knowledge, skill, or experience in his job as a veteran money lender to qualify him as an expert on the value of real properties that he owns.  *See Hornick*, 2008 WL at **4 (investor-owner could opine on value of property he owned despite only minimal knowledge of surrounding real estate market); *Malloy*, 73 F.3d at 1016 (residential contractor qualified as expert on value of homes he owned).

Even if, as James River argues, the authorities listed above do not apply here, a reading of the plain language of Fed. R. Evid. 702 also supports the idea that property ownership can lead to expert qualification. *See* Fed. R. Evid. 702, advisory comm. notes ("Nothing in this amendment is intended that experience alone – or experience in conjunction with other knowledge, skill, training or education – may not provide a sufficient foundation for expert testimony."). As James River points out, an owner has a financial or personal interest in the value of the property, which, while it may render his or her opinion biased, also makes that opinion informed. An owner's bias is an obvious target of cross examination and impeachment, but not a reason for disqualification. Additionally, an owner's knowledge, skill, or experience regarding the value of a piece of real property that he or she owns will usually be superior to the knowledge, skill, or experience of outside observers. Even if the owner has little or no experience in property development or appraisal, absent a showing otherwise, there exists a presumption that his or her relationship with the property amounts to knowledge and experience sufficient to qualify the owner under Fed. R. Evid. 702. The Court finds nothing in *Daubert* or its progeny that would alter this outcome.

In short, Mr. Miller can qualify as an expert on the pre-fire value of the North Building. Qualification, however, does not end the analysis and the Court will now turn to the reliability of Mr. Miller's methodology.

### III. OPINION MUST BE BASED ON SUFFICIENT FACTS OR DATA AND THE PRODUCT OF RELIABLE METHODS.

In addition to examining a witness' qualifications, Rule 702 mandates that expert testimony must be "(1) based upon sufficient facts or data (2) . . . the product of reliable principles and methods, and (3) . . . applied . . . reliably to the facts of the case." Fed. R. Evid. 702. This second prong of Rule 702 requires the Court to determine what methodology Mr. Miller actually used and then to determine whether the method used is sufficiently reliable. Reliability under Fed. R. Evid. 702 depends on whether Mr. Miller's reasoning and method are "scientifically valid." *Hollander v. Sandoz Pharmas. Corp.*, 289 F.3d 1193, 1204 (10th Cir. 2002). Scientific validity does not require the proponent of the expert to prove that the expert's opinion is objectively correct. *Mitchell*, 165 F.3d at 781. Instead, the Court should focus on the sufficiency of the expert's data sources and the chosen methodology and application of the methodology to the appropriate facts. *Daubert*, 509 U.S. at 595; *Dodge*, 328 F.3d at 1222. In other words, did Mr. Miller use enough facts or data to produce a reliable valuation and is his conclusion based on a reliable application of a logical and scientific method of analysis?

Although the Court has found that Mr. Miller is qualified to offer expert opinion testimony, the Court finds that his opinion lacks the necessary foundation of facts or data. This failure seriously taints the reliability of his methodology and, thus, precludes admission of his testimony.

**A.      Sufficient Facts or Data**

The Court must assess the sufficiency of the foundation for Mr. Miller's opinion: the underlying facts and data. *See* Fed. R. Evid. 702 (expert witness may testify if "the testimony is based upon sufficient facts or data"). During his testimony at the Daubert hearing, Mr. Miller did not adequately explain what facts and data he used to arrive at his pre-fire value figure. For this reason, the Court concludes that Rapid Funding has not done enough to meet its burden to admit Mr. Miller's testimony.

The plain language of Rule 702 requires an expert to base his or her opinion on sufficient facts or data. Even if an expert presents impeccable credentials, he or she cannot speculate or jump to an opinion without factual support. *Goebel*, 215 F.3d at 1088 ("It is axiomatic that an expert, no matter how good his credentials, is not permitted to speculate."). A party's failure to support expert opinion with sufficient facts and data requires exclusion of the unsupported evidence. *See, e.g., Hathaway v. Bazany*, 507 F.3d 312, 318 (5th Cir. 2007) (excluding expert evidence when proposed expert offered "little more than personal assurances based on . . . experience"). Thus, admissible expert opinion requires a foundation based on facts that allow the expert "to express a reasonably accurate conclusion as opposed to conjecture or speculation . . . ." *See Gomez v. Martin Marietta Corp.*, 50 F.3d 1511, 1519 (10th Cir. 1995). However, "absolute certainty is not required." *Id.*

When reviewing the basis for an expert's opinion, courts in this circuit should focus on the quantitative sufficiency of the facts behind the opinion, not the quality.

*See U.S. v. Lauder*, 409 F.3d 1254, 1264 n.5 (10th Cir. 2005) (analysis of facts and data under Rule 702 is quantitative not qualitative); *Crabbe*, 556 F. Supp. 2d at 1223 (trial court should not assess the underlying reliability of the figures used by expert in making a determination regarding admissibility – that is a jury's job); *see also* Fed. R. Evid. 702 advisory comm. notes (same).

In the instant case, Mr. Miller concludes that the North Building had a pre-fire value of $4,489,731. He arrived at this figure by taking the amount it would cost to build a new North Building, $7,145,093, and subtracting depreciation of 40 percent, $2,858,037.20. Mr. Miller reasoned that replacement cost minus depreciation would produce an accurate estimate of the value of the North Building's value before the fire. Mr. Miller relied on an outside source to estimate the replacement cost for the North Building. To get the second half of his formula, the depreciation percentage, Mr. Miller divided the amount of money it would cost to rehabilitate each unit in the North Building before the fire to like new condition, $20,000, by the amount it would cost to completely replace each unit, $50,000. Accordingly, $20,000 divided by $50,000 equals 40% depreciation. Under Mr. Miller's theory, the $20,000 figure should account for all of the infirmities that plagued the North Building before it burned and, thus, is a critical piece of Mr. Miller's opinion. Moreover, because of the simplicity of Mr. Miller's valuation formula, the facts and data that Mr. Miller input into his depreciation calculation take on an especially vital role in his overall opinion. In fact, Mr. Miller's overall valuation opinion and his depreciation opinion both relied solely on pre-fire rehabilitation cost

and post-fire replacement costs, *i.e.*, Mr. Miller's entire opinion essentially relied on only two numbers.

Unfortunately, for James River, Mr. Miller provided very little foundation for his $50,000 figure (post-fire) and almost no foundation for his $20,000 figure (pre-fire). Given the importance of these two numbers, the dearth of evidence to support either cost estimate raises serious problems for the admissibility of Mr. Miller's opinion evidence. Regarding the $50,000 number, Mr. Miller testified that Rapid Funding hired the Anderson Group to estimate the post-fire replacement cost of the North Building. Although this was minimal, the Anderson estimate allowed Mr. Miller to deduce a post-fire, per-unit replacement cost of $50,000 that he used as part of his depreciation calculation.

The other critical component needed to complete the depreciation calculation was the pre-fire rehabilitation cost, which he calculated at $20,000. However, in contrast to the $50,000 figure, the record is completely devoid of any facts or data upon which Mr. Miller could base his pre-fire rehabilitation cost. Indeed, when asked how he arrived at the $20,000 pre-fire rehabilitation estimate, Mr. Miller stated that he has "a feeling" about how much it would cost to rehabilitate each unit to like new condition. Moreover, Rapid Funding did not substantiate its pre-fire rehabilitation figure in its submissions to James River, which Rapid Funding relied on in opposing James River's *Daubert* motion. Those figures appear to be the same "feeling" based numbers that Mr. Miller relied on to deduce his valuation opinion. *Daubert* and Rule 702 require

more than a "feeling."  *See, e.g., Hathaway*, 507 F.3d at 318 (excluding expert

testimony based on "personal assurances").

The Court views Rule 702 and *Daubert* and its progeny as precluding exactly the

type of unreliable, unsupported opinion testimony that Rapid Funding proffers in this

case.  If the Court were to admit Mr. Miller's testimony, the jury would be left with the

impression that his opinion is the product of some type of systematic collection of

facts and data regarding the North Building's value, when, in fact, the opposite is true:

Mr. Miller's opinion is based solely on his "feeling" regarding the pre-fire rehabilitation

costs for the North Building.[3]  Facts and data can be reviewed on cross-examination,

but James River has no way to examine Mr. Miller's feelings and there is a significant

possibility that the jury would be led astray or confused by Mr. Miller's valuation

testimony.  The lack of facts and data are especially troubling given the minimal

amount of adjustment allowed by Mr. Miller's simple valuation and depreciation

formulas.  It seems that all of the intellectual heavy lifting in Mr. Miller's opinion should

have been done by culling a pool of available pre- and post-fire cost figures, because

those figures would account for all of the potential variations in the North Building's

value.  But, Mr. Miller's failure to introduce sufficient facts and data on those figures

---

[3] Pre-*Daubert* case law also supports the idea that "subjective" valuation evidence should not be admitted as expert opinion without supporting facts and data. *See Eastridge Development Co. v. Halpert Assocs., Inc.*, 853 F.2d 772, 782 (10th Cir. 1988) (excluding "largely subjective" expert opinion evidence on ground that it was "tentative and speculative").

leaves the Court with no way to determine whether Mr. Miller has done the appropriate analysis to arrive at a reliable opinion, even if his methods are otherwise valid.[4]

Thus, because the foundation upon which Mr. Miller's testimony rests is riddled by an impermissible lack of facts or data, his opinion must be excluded in this case as unreliable. *See In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 745 (3d Cir. 1994) (noting that "any step that renders the analysis unreliable under the *Daubert* factors renders the expert's testimony inadmissable."). Even though the lack of facts or data alone is a ground for exclusion of his valuation opinion, the Court will now turn to James River's additional arguments to adequately develop the record.

**B. Reliable Principles and Application to the Facts of the Case**

James River wages a two-pronged attack on Mr. Miller's methodology in this case. It contends (1) that Mr. Miller did not use an established depreciation schedule on which he could account for the North Building's age in making his valuation opinion, and (2) that his methods do not comport with accepted appraisal methods and rules, specifically, the broad evidence rule.

1. <u>James River's Arguments Regarding Mr. Miller's Methodology</u>

James River contends that Mr. Miller's failure to use an accepted depreciation schedule renders his valuation methodology unreliable. The IRS has determined that new apartment buildings have an estimated useful life of 40 years. Relying on the IRS

---

[4] Moreover, as can be seen in the following section discussing Mr. Miller's method-ology, the lack of sufficient facts or data also corrupts the reliability of Mr. Miller's valuation methodology when his methods are analyzed under the *Daubert* factors.

schedule, James River argues that depreciation of the North Building should be nearer to 95 percent, not 40 percent as postulated by Mr. Miller, because 38 years divided by 40 years equals a depreciation of 95 percent. Rapid Funding responds that Mr. Miller could logically ignore the 40-year IRS depreciation figure since that figure is only applicable to new buildings. Rapid Funding also counters that applying James River's depreciation theory would lead to the absurd result that any building older than 40 years automatically has a negative value. Although the IRS schedule may have provided a more concrete basis for depreciation calculations, the Court disagrees with James River that Mr. Miller should have relied *exclusively* on the 40-year depreciation schedule. Disagreement regarding the IRS depreciation schedule notwithstanding, as explained below, the Court finds that the methodology used by Mr. Miller to reach his opinion as to valuation does not meet the reliability standard of Rule 702.

James River also touts its "Mr. Miller is not an appraiser" theory to argue against the reliability of Mr. Miller's methodology. James River contends that Mr. Miller's inability to identify a specific example of another appraiser approving of or using Mr. Miller's depreciation formula indicates that his methods are unreliable. Again, James River's view is an overly narrow one, because the Court cannot say that lack of appraisal qualifications automatically renders a property valuation opinion unreliable. However, the Court agrees with James River that Rapid Funding has not met its burden of demonstrating that the appraisal and property valuation communities have reviewed and accepted the methodology applied by Mr. Miller. These findings indicate that

Mr. Miller's valuation methods in this case are too unreliable to be admitted into evidence.

        2.        <u>Application of the *Daubert* Factors to Mr. Miller's Methodology</u>

The Court will evaluate James River's two-pronged challenge to  Mr. Miller's methodology using the non-exhaustive list of factors set forth by Justice Blackmun:

(1)     whether the method is susceptible to testing and has been subject to such testing;

(2)     whether the method has been subjected to peer review;

(3)     whether there is a known or potential error rate associated with the methodology used; and

(4)     whether the relevant community of experts has accepted the expert's theory.

*See Daubert*, 509 U.S. at 593-94; *see also Truck Ins. Exch. v. MagneTek, Inc.*, 360 F.3d 1206, 1210 (10th Cir. 2004).  These factors are not determinative and should be applied in a flexible fashion.  *Daubert*, 509 U.S. at 593-94.

Regarding the first *Daubert* factor, Mr. Miller's methodology cannot be tested for accuracy or reliability.  Mr. Miller's valuation opinion depends entirely on his depreciation calculation, which, in turn, depends entirely on the data that Mr. Miller put into the formula.  As described in the previous section, although one half of the formula – the post-fire replacement cost – was based on a potentially testable, objective estimate from the Anderson Group, the other half of the formula – the pre-fire rehabilitation cost – was based on Mr. Miller's "feeling generally . . . about what it is going to cost a unit to bring it up to a near new condition."  (Hearing Transcript,

February 13, 2008, at 25:8.)  This "feeling" is the sole evidence in the record supporting Mr. Miller's calculation of the $20,000 per-unit rehabilitation cost.  Feelings, however, are not scientifically testable.  Thus, even if the Court were to ignore Mr. Miller's rather rudimentary process for determining the depreciation figure of 40%, the Court cannot overlook the lack of underlying facts and data that make Mr. Miller's methods impossible to test in this case.  Indeed, for purposes of cross examination, James River is left with nothing more than Mr. Miller's "feeling" as the starting point for any comparative analysis of his methods.  Therefore, the first *Daubert* factor cuts in favor of James River.

With respect to the second *Daubert* factor, peer review, neither party presented evidence relating to any type of critical review of Mr. Miller's methodology.  Although Rapid Funding attempted to highlight Mr. Miller's own articles on property valuation, Rapid Funding presented no evidence that his depreciation methodology (pre-fire rehabilitation cost divided by post-fire reconstruction cost) had been reviewed, critiqued, or analyzed by other experts in the property appraisal or valuation industries.  Nor do Mr. Miller's own articles, which Rapid Funding admitted as exhibits during the *Daubert* hearing, indicate any measure of peer review of the specifics of Mr. Miller's methodology in this case.  Moreover, even if the Court viewed Mr. Miller's articles as evidence of peer review of his general techniques, Rapid Funding did not identify a single piece of industry literature supporting the concept that unsubstantiated "feelings" are sufficient to render a reliable valuation opinion.  Thus, because the appraisal and valuation industries have not critically evaluated and approved of Mr. Miller's valuation

methodology, this factor supports excluding his opinion on the value of the North Building.

Turning to the fourth factor [5], acceptance in the relevant field of study, both parties indicate that the broad evidence rule, a widely recognized method for calculating property values, should apply in this case. This rule mandates that an appraiser or evaluator should base his property valuation on "every fact and circumstance that would logically bear on determining the value of the property," and the rule suggests 21 separate factors to consider. (*See* Defs. Ex. 5 to *Daubert* hearing, February 13, 2008.) However, in contrast to the rule, Mr. Miller did not identify any objective facts or circumstances that went into his "feeling" on the pre-fire rehabilitation cost estimate. Thus, his methodology conflicts with the industry standard that Rapid Funding admits should apply in this case. Even if Mr. Miller did rely on some of the broad evidence factors, he did not identify them as a basis for his opinion. Additionally, Mr. Miller testified that he was unaware whether his depreciation methodology had been widely accepted in the field. Thus, based on the evidence (or lack thereof) presented to this Court at the Daubert hearing, the Court has not been persuaded that the methodology used by Mr. Miller to arrive at his valuation opinion has either been accepted by the property valuation community or meets industry standards. *See, e.g., In re Breast*

---

[5] The third *Daubert* factor, whether a known or potential error rate exists, also appears to support exclusion of Mr. Miller's valuation testimony. However, because James River did not specifically argue this point, and because the other factors are sufficient to support the Court's decision, the Court will not address it.

*Implant Litig.*, 11 F. Supp. 2d 1217, 1227 (D. Colo. 1998) (excluding proposed expert's conclusions that were contradicted by established scientific studies).

At the hearing, Rapid Funding attempted to sidestep the problems with Mr. Miller's methodology by relying heavily on Mr. Miller's experience as evidence of the reliability of his methodology. However, as noted above, experience does not automatically equate to a reliable methodology. *See Goebel*, 215 F.3d at 1088 ("It is axiomatic that an expert, no matter how good his credentials, is not permitted to speculate."). This is especially true when Mr. Miller's relevant experience in the Michigan property market is limited, as it is in this case. Further, although it does not weigh heavily in the Court's decision, Mr. Miller has no accreditation by any appraisal regulation body or state entity. Mr. Miller's lack of appraisal credentials goes more to his qualifications, but constitutes another fact that persuades the Court to find that Mr. Miller's experience is not enough to overcome the problems with the reliability of his depreciation calculation.

Thus, although the Court does not entirely agree with James River's arguments on Mr. Miller's methodology, Mr. Miller's methods cannot be tested and have not been reviewed or accepted in the relevant community. These factors lead the Court to conclude that Mr. Miller's methodology in calculating a valuation opinion for the North Building is too unreliable to present to a jury.

**CONCLUSION**

In sum, well-established case law indicates that Mr. Miller is qualified to opine as an expert on the value of the North Building by virtue of his ownership. However, Mr. Miller failed to use sufficient facts and data to arrive at his valuation conclusions. This failure tainted his methodology, rendering it impervious to testing and incapable of repetition without threat of inconsistent results. Moreover, his valuation methods have not been reviewed or accepted in the relevant fields of study. Accordingly, the Court finds that Mr. Miller's opinion on the valuation of the North Building should be excluded pursuant to *Daubert* and the Federal Rules of Evidence.

Accordingly, James River's Motion to Exclude Mr. Miller's Testimony (Doc. # 72) is GRANTED and evidence of Mr. Miller's opinion on the value of the North Building will be excluded from trial in this matter.

DATED: February __24__, 2009

BY THE COURT:

_____
CHRISTINE M. ARGUELLO
United States District Judge