**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Christine M. Arguello**

Civil Action No. 07-cv-01146-CMA-BNB

JAMES RIVER INSURANCE COMPANY, an Ohio corporation,

      Plaintiff,

v.

RAPID FUNDING, LLC, a Colorado Limited Liability Company,

      Defendant.

---

## ORDER REGARDING POST-TRIAL MOTIONS

---

This matter is before the Court on a bevy of post-trial motions: (1) Defendant's Motion to Increase Exemplary Damage Award or in the Alternative Award Double Damages and Attorney's Fees (Doc. # 216); (2) Defendant's Motion for Award of Prejudgment Interest (Doc. # 217); (3) Plaintiff's Motion for a New Trial (Doc. # 220); (4) Plaintiff's Motion for a Remittitur (Doc. # 221); (5) Plaintiff's Renewed Motion for Judgment as a Matter of Law (Doc. # 222); (6) Defendant's Motion for Review of Taxation of Costs (Doc. # 236); and (7) Plaintiff's Request for Oral Argument on its Motion for New Trial and Motion for Remittitur (Doc. # 253).

## I.  <u>BACKGROUND</u>

This case involves an insurance coverage dispute.  Defendant Rapid Funding, LLC ("Rapid Funding") owned a multi-building apartment complex that it insured with Plaintiff James River Insurance Company ("James River").  (*See* Doc. # 128 at 2.)  The

policy was a commercial property policy with a limit of $3 million for a loss to the complex. (*Id.* at 3.) Following a fire that destroyed one of the buildings, Rapid Funding submitted a claim for its policy limit, which James River rejected. (*Id.*) This lawsuit stems from a serious disagreement over the value of the damaged building. (*Id.*)

The case was tried to a jury in April and May of 2009. The jury found for Rapid Funding on both of its claims: breach of insurance contract and bad faith. (Doc. # 210-3.) It awarded Rapid Funding $3 million in actual damages and $2.35 million in punitive damages. (*Id.*) The instant post-trial motions challenge the verdict itself, the award of damages, and various other items regarding interest and costs.

## II.  ANALYSIS

Because James River's motions attack the sufficiency of the jury's verdict and, if successful, would obviate the need to consider Rapid Funding's motions for damages, interest, and costs, the Court considers James River's arguments first.

### A.  JAMES RIVER'S MOTIONS

James River attacks the jury's verdict in three different pleadings: a motion for new trial (Doc. # 220), a renewed motion for judgment as a matter of law (Doc. # 222), and a motion for remittitur (Doc. # 221). However, these motions all rest on the same essential contention – that the evidence at trial was insufficient to support the jury's conclusion that Rapid Funding suffered $3 million in actual damages. James River's basic claim is that the testimony of Rapid Funding's owner, Andrew Miller, concerning the value of the damaged building was unreliable and that, without such testimony,

there is no evidence to support the verdict.  (*See* Doc. # 220 at 3-4; Doc. # 222 at 1;

Doc. # 221 at 2.)

A party challenging a jury's verdict bears a heavy burden.

> "Where a new trial motion asserts that the jury verdict is not supported by the evidence, the verdict must stand unless it is clearly, decidedly, or overwhelmingly against the weight of the evidence." *Anaeme v. Diagnostek, Inc.*, 164 F.3d 1275, 1284 (10th Cir.) (quotation omitted), *cert. denied*, 528 U.S. 814 (1999).  The court considers the evidence in the light most favorable to the prevailing party, *see United Int'l Holdings, Inc. v. The Wharf (Holdings) Ltd.*, 210 F.3d 1207, 1227 (10th Cir. 2000), bearing in mind that "[t]he jury . . . has the exclusive function of appraising credibility, determining the weight to be given to the testimony, drawing inferences from the facts established, resolving conflicts in the evidence, and reaching ultimate conclusions of fact." *United Phosphorus, Ltd. v. Midland Fumigant, Inc.*, 205 F.3d 1219, 1226 (10th Cir. 2000) (quotation omitted).

*Snyder v. City of Moab*, 354 F.3d 1179, 1187-88 (10th Cir. 2003); *see also Jackson v.*

*Potter*, 2008 WL 4969162, *1 (D. Colo. 2008) ("A motion for new trial 'is not regarded

with favor and should only be granted with great caution.'" (quoting *United States v.*

*Kelley*, 929 F.2d 582, 586 (10th Cir. 1991))).  Similarly, judgment as a matter of

law "is warranted only if the evidence points but one way and is susceptible to no

reasonable inferences supporting the party opposing the motion." *Id.* at 1184.  Again,

the evidence "and any inferences to be drawn therefrom" are viewed in the light most

favorable to the non-moving party.  *Id.*  And finally, remittitur, which permits a court to

reduce a damages award, is appropriate only where the award is clearly unreasonable;

"[a]bsent an award so excessive as to shock the judicial conscience and to raise an

irresistible inference that passion, prejudice, corruption or other improper cause invaded

the trial, the jury's determination of the damages is considered inviolate." *Fitzgerald v.*

*Mountain States Tel. and Tel. Co.*, 68 F.3d 1257, 1261 (10th Cir. 1995) (citing *Malandris v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 703 F.2d 1152, 1168 (10th Cir. 1981) (*en banc*)).

The threshold component of James River's challenge is that Mr. Miller's valuation testimony was improperly admitted.  At trial, Mr. Miller testified that the actual cash value of the damaged building was $4.489 million.  (*See, e.g.*, Doc. # 220, Ex. A at 109:21-110:6.)  This testimony was given as lay witness opinion; prior to trial, the Court granted James River's motion to exclude Mr. Miller's purported *expert* testimony on the same topic.[1]  (*See* Doc. # 126.)  James River argues that Mr. Miller offered his rejected expert opinion into evidence through the back door by testifying to value as a lay witness.  James River focuses on the provisions of Federal Rule of Evidence 701, which permits lay witness opinion testimony provided that the opinions

> are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) *not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.*

Fed. R. Evid. 701 (emphasis added).  James River claims that the valuation testimony is "scientific, technical, or other specialized knowledge" within the scope of Rule 702 – after all, Mr. Miller originally sought to give expert testimony under that rule – and thus Mr. Miller's "lay opinion" should not have been allowed.  The Court is not convinced.

---

[1]  Mr. Miller's "expert" valuation conclusion was the same as his lay witness conclusion, i.e., that the damaged building had actual cash value of $4.489 million.  (Doc. # 126 at 4.)

It is true that if testimony is based on "scientific, technical, or other specialized knowledge," its admissibility is determined under Rule 702, not Rule 701. Parties cannot circumvent expert reliability requirements by "proffering an expert in lay witnesses clothing." Fed. R. Evid. 701 advisory committee notes, 2000 amendments. However, as the Court noted at the final trial preparation conference, the question of whether Mr. Miller's valuation opinion was, as a matter of law, a Rule 702 expert opinion, was not specifically addressed when the Court ruled on the motion to exclude testimony. (Doc. # 244, Ex. B at 42-43; *see also* Doc. # 126 at 10 (noting that the two questions addressed in the motion to exclude were (1) whether Mr. Miller was qualified on the basis of knowledge, skill, or training and (2) whether Mr. Miller's reasoning and methodology were sufficient).) Considering this precise question, it is not at all clear that Mr. Miller's opinion should have been challenged under Rule 702. *Cf.* Fed. R. Evid. 701 advisory committee notes, 2000 amendments ("[M]ost courts have permitted the owner or officer of a business to testify to the value . . . of the business, without the necessity of qualifying the witness as an accountant, appraiser, or similar expert. . . . Such opinion testimony is admitted not because of experience, training or specialized knowledge within the realm of an expert, but because of the particularized knowledge that the witness has by virtue of his or her position in the business."). Moreover, the jury was expressly instructed that Mr. Miller was testifying as a lay witness, by virtue of his position as an officer of the company that owned the damaged building, and not as an expert witness. (Doc. # 210-2 at Instr. 11.) As "[j]urors are presumed to follow the

judge's instructions," *United States v. Templeman*, 481 F.3d 1263, 1266 (10th Cir. 2007), this instruction obviated the risk that the jury impermissibly considered Mr. Miller an "expert."[2]  For all of these reasons, the Court does not believe that Mr. Miller's lay opinion testimony was admitted in error.[3]

But even assuming that Mr. Miller's testimony was erroneously allowed, James River's post-trial motions would still be denied.  The second, necessary component of James River's position is that, without Mr. Miller's testimony, there was no evidence from which the jury could have concluded that Rapid Funding's actual damages were $3 million. (*See* Doc. # 220 at 3-4; Doc. # 222 at 3; Doc. # 221 at 2.)  However, James River's own expert witness, John Meyer, admitted that Rapid Funding's property was "worth" more than $6.6 million, assuming habitable condition.  (Doc. # 234, Ex. G at 46:17-47:16; *see also id.*, Ex. F.)  It is true that Mr. Meyer then applied an additional "habitability factor" discount of $8.25 million, which led to his final conclusion that the property had an overall negative value.  But there was testimony – from one of James

_____

[2]  James River argues that this instruction did not cure the prejudice of Mr. Miller's testimony because the jury was still under the illusion that the testimony was based on a "reliable and legally permissible methodology" when the Court had already rejected the credibility of that methodology.  (Doc. # 244 at 10.)  This argument misses the mark. Methodology is a concern for expert testimony under Rule 702, not for lay testimony under Rule 701.

[3]  As to remittitur, James River appears to argue that even if Mr. Miller's testimony was proper, the actual damages awarded would still be excessive in light of numerous other valuations that the damaged building was worth somewhere between $40,000 and $940,000. (Doc. # 221 at 16-17.)  But even accepting these other valuations, a damages award that falls between the low end ($40,000 to $940,000) and the high end ($4.489 million) does not "shock the judicial conscious."  *Fitzgerald*, 68 F.3d at 1261.

River's own officials – that such an approach was "novel" and that she had "never come across a [valuation] finding like that." (Doc. # 234, Ex. H at 228:10-16; 138:25-139:9.) Rapid Funding's expert also testified that application of the "extra habitability factor" was something he had never seen before and that it used "incomprehensible" logic. (Doc. # 234, Ex. I at 116:20-117:12.) Drawing all inferences in Rapid Funding's favor, as the Court must, a reasonable jury could have concluded from this combination of testimony that Mr. Meyer's testimony that the property was worth $6.6 million was credible, but that his additional habitability discount was not. (*See* Doc. # 210-2 at Instr. 10 (instructing jury that, in considering expert testimony, they could "accept it or reject it, **in whole or in part**" (emphasis added)).) In other words, the jury could have fully discounted Mr. Miller's testimony and still had evidence on which to base its $3 million damages assessment. As a result, and regardless of whether the challenge is a motion for new trial, motion for judgment as a matter of law, or remittitur, the jury's presumptively inviolate determination of damages must be upheld.[4]

**B. RAPID FUNDING'S MOTIONS**

Unlike James River's motions, which could be analyzed collectively, Rapid Funding's motions seek separate and discrete relief. The Court considers each motion in turn.

---

[4] In light of this disposition, the Court denies James River's request for oral argument (Doc. # 253) as moot.

**1.      Motion for Additional Damages**

Colorado law, which governs this diversity action, provides certain mechanisms

for increasing damage awards.  Rapid Funding seeks to take advantage of two of those

mechanisms: Colo. Rev. Stat. § 13-21-102(3), which gives the Court discretion to treble

exemplary damages for continued willful and wanton misconduct; and Colo. Rev. Stat.

§ 10-3-1116, which allows an insured to seek double damages and attorney's fees for

an insurer's unreasonable denial of a claim.

As noted above, the jury awarded Rapid Funding $2.35 million in punitive

damages on top of $3 million in actual damages.  Typically, such an award would

approach the punitive damages cap; "[t]he amount of . . . reasonable exemplary

damages shall not exceed an amount which is equal to the amount of the actual

damages awarded to the injured party."  Colo. Rev. Stat. § 13-21-102(1)(a).  However,

pursuant to section 13-21-102(3)(a), a court

> may increase any award of exemplary damages, to a sum not to exceed
> three times the amount of actual damages, if it is shown that . . . [t]he
> defendant has continued the behavior or repeated the action which is the
> subject of the claim against the defendant in a willful and wanton manner,
> either against the plaintiff or another person or persons, during the
> pendency of the case . . . .

In other words, if "extraordinary circumstances are present," *Corbetta v. Albertson's,*

*Inc.*, 975 P.2d 718, 723 n.7 (Colo. 1999), the Court "***may*** exercise its discretion to

increase punitive damages," *Netquote, Inc. v. Byrd*, 2009 WL 902437, *15 (D. Colo. Apr.

1, 2009) (emphasis in original).

Rapid Funding's argument for increasing the already substantial punitive damages award is based on the trial testimony of James River's chief claims officer, Anne Marie Marson. Ms. Marson testified that she continued to review Rapid Funding's claim throughout the litigation but determined that James River still lacked sufficient information to establish the actual cash value of the damaged building. (Doc. # 216 at 4-5.) From this, Rapid Funding contends that James River acted wilfully and wantonly by continuing to deny Rapid Funding's claim "during the pendency of the case." Colo. Rev. Stat. § 13-21-102(3)(a). (*See also* Doc. # 216 at 6-7.) In response, James River argues that it did nothing more than decline to reverse its claim decision and that such a decision to protect and litigate its interest should not serve as a basis for additional punitive damages. (Doc. # 228 at 6-9.) Under the circumstances of this case, the Court agrees with James River.

Ms. Marson testified that she had not received an expert appraisal from Rapid Funding as to actual cash value. (Doc. # 216 at 5.) According to her testimony, it was this fact that compelled the decision to maintain James River's claim position. (*Id.*) While this Court had previously ruled that an expert report was not necessary for Rapid Funding to take this case to trial (*see* Doc. # 128 at 8 (denying James River's motion for summary judgment)), that ruling was not a determination that James River must abandon its position or face treble punitive damages. Even assuming that an insurance company's decision to stand firm on its position could, in some circumstances, constitute extraordinary circumstances sufficient to implicate section 13-21-102(3),

in the instant case, where Rapid Funding has already been awarded nearly twice its insurance policy limit, the Court declines to further increase the damages.

Rapid Funding also contends that it is entitled to additional damages and attorney's fees under Colo. Rev. Stat. § 10-3-1116. That section provides that a claimant "whose claim for payment of benefits has been unreasonably delayed or denied may bring an action in a district court to recover reasonable attorney fees and court costs and two times the covered benefit." Colo. Rev. Stat. § 10-3-1116(1). Rapid Funding acknowledges that this Court previously ruled that the statute did not apply because the denial at issue occurred in 2006, well before the statute's enactment. However, Rapid Funding contends that Ms. Marson's trial testimony indicates that James River "actively re-consider[ed]" its claim decision after the statute's effective date and that this discrete, subsequent conduct brings the statute into play.[5] (Doc. # 216 at 8-10.) In response, James River argues that the prior ruling controls and precludes a claim under the statute. The Court again agrees with James River.

In initially dismissing Rapid Funding's claim under section 10-3-1116, the Court ruled that the statute did not apply retroactively and that, because there was no new injury arising from conduct subsequent to the statute's enactment, the claim was barred. (Doc. # 128 at 16-19.) Of particular relevance to Rapid Funding's present position, the Court ruled that:

---

[5]  Rapid Funding does not appear to be challenging the Court's prior ruling itself, but rather seems to be arguing that the prior ruling is not inconsistent with its present position that new, actionable conduct has occurred. The Court does not, therefore, construe Rapid Funding's motion to seek reconsideration of the prior ruling.

an insurer's ongoing conduct, if it can be traced back to the same injury to the insured, although relevant to a claim for breach of GFFD [good faith and fair dealing], does not result in additional claims.

In the instant case, Rapid Funding argues that James River's failure to act on each new piece of information unearthed by discovery in this case leads to the accrual of a new breach of the GFFD claim. This argument ignores [relevant Colorado case law], as well as well-established rules against double recovery. Rapid Funding does not allege any new injury or damages resulting from James River's behavior after [the statute was enacted]. Rather, Rapid Funding's entire claim stems back to James River's 2007 failure to pay for the loss of the North Building. Additionally, Rapid Funding has not pointed to any new breach of contract by James River after [the statute's enactment] (*i.e.*, an additional claim for benefits that James River has unreasonably delayed). Again, Rapid Funding's claim traces back to events prior to [the statute's enactment]. Thus, Rapid Funding's position defies well settled legal rules against double recovery because Rapid Funding seeks multiple payments from the same legal theory even though it has alleged only one, distinct injury caused by one breach of James River's duty to act in good faith.

Rapid Funding's position, if adopted, would also lead to a logistical nightmare. Indeed, if the Court accepted Rapid Funding's argument and held that each new fact brought out during discovery created the basis for a new and separate breach of a GFFD claim, a pleading and docketing quagmire would ensue as the parties constantly amended their pleadings in response to new depositions and discovery responses. The end result would be dozens of bad faith claims in this lawsuit all relating to the initial loss and denial of benefits. This Court is not going to open the door to this pandora's box.

(Doc. # 128 at 18-19.)

There is no principled distinction between the "information unearthed in discovery" and the testimony of Ms. Marson that she continued to review new information up through trial; the risk of permitting a separate bad faith claim each time a new fact is considered is equally prevalent in both circumstances. Rapid Funding still has not pointed to "any new breach of contract by James River after [the statute's

enactment] (i.e., an additional claim for benefits that James River has unreasonably delayed)." As Rapid Funding's argument is in direct conflict with the Court's previous ruling, it must be rejected.

### 2. Motion for Prejudgment Interest

Colorado law also provides for an award of prejudgment interest to the prevailing party. Where the action does not involve personal injury, the interest calculation is governed by Colo. Rev. Stat. § 5-12-102, which provides, in relevant part, that "[i]nterest shall be at the rate of eight percent per annum compounded annually for all moneys or the value of all property **after they are wrongfully withheld** or after they become due to the date of payment or to the date judgment is entered, whichever first occurs." *Id.* § 5-12-102(1)(b) (emphasis added). In a breach of contract action, such as the instant case, the "wrongful withholding" occurs at the time of the breach. *Goodyear Tire & Rubber Co. v. Holmes*, 193 P.3d 821, 826 (Colo. 2008). In the insurance context, the breach occurs not when the insured demands payment under the policy, but rather when the insurer subsequently refuses to pay. *See Bowen v. Farmers Ins. Exch.*, 929 P.2d 14, 17 (Colo. App. 1996).

The parties agree that prejudgment interest is due; their dispute centers on the date on which that interest began to accrue. Rapid Funding contends that the interest calculation should begin on March 23, 2007, which is the day it submitted its first "Sworn Statement in Proof of Loss" seeking its $3 million policy limit. (Doc. # 217 at 2-3.) James River, on the other hand, argues that the more appropriate date is May 30, 2007,

the date it rejected Rapid Funding's second Proof of Loss.  (Doc. # 229 at 3.)  James River has the better of the argument.

In submitting its first Proof of Loss, Rapid Funding included documentation that, it contended, showed it was entitled to $3 million in insurance proceeds.  (Trial Ex. 15.)  On April 20, 2007, James River rejected this proof of loss "because it does not comply with the provisions of the policy of insurance."  (Trial Ex. 16.)  Although Rapid Funding argued that this rejection was "ridiculous," it submitted a second Proof of Loss on May 3, 2007 that included additional information requested by James River.  (Trial Ex. 17.)  In this second Proof of Loss, Rapid Funding expressly noted its expectation that James River would "promptly advise its insured . . . of its determination of the undisputed payments that are owed."  (*Id.* at RF 3094.)  In other words, as of May 3, Rapid Funding appears not to have viewed its claim as denied, but rather considered James River to be analyzing the coverage decision.  On May 30, 2007, James River officially rejected the $3 million claim on the ground that Rapid Funding overvalued the damaged building.  (Trial Ex. 18.)  It did, however, agree to pay for the cost of debris removal and for emergency response.  (*Id.*)

A common sense consideration of this chronology makes clear that May 30, 2007, is the day on which coverage was rejected and, thus, the date the insurance contract was breached.  Rapid Funding argues that James River's initial rejection of its Proof of Loss was based on "mere technicalities" and that, typically, an insurance payment is made contemporaneously with the Proof of Loss.  While that may be

typical,[6] it did not happen here.  In response to the initial rejection, Rapid Funding provided additional information, albeit grudgingly.  It was not until that information was received and reviewed that the coverage decision was made.  Rapid Funding cites to no compelling evidence that James River was improperly stalling or delaying the payment of the claim until it considered the new information.  *See Bowen*, 929 P.2d at 16 (noting that the purpose of the prejudgment interest statute is to "discourage persons responsible for the settlement of claims from stalling or delaying payment until final settlement or judgment").  Under these circumstances, the Court finds that May 30, 2007, is the appropriate date on which to begin calculating prejudgment interest.  As the parties agree that an award of $481,446.58 properly reflects prejudgment interest from that date (Doc. # 229 at 3 n.1; Doc. # 243 at 2), the Court orders payment of that amount.

### 3.    Motion for Review of Taxation of Costs

Rapid Funding's final motion seeks a review of the Clerk of the Court's determination of the costs Rapid Funding was permitted to recover.  Rapid Funding submitted a bill of costs requesting $154,561.89.  (Doc. # 218.)  The Clerk reduced these costs to $7,089.34.  (Doc. # 230.)  Rapid Funding contests some, but not all, of these reductions.  (Doc. # 236.)

---

[6]  The testimony cited by Rapid Funding is that, when coverage is *not* in dispute, payment is usually made immediately upon submission of the Proof of Loss.  Of course, coverage was in serious dispute in this case.

Pursuant to Federal Rule of Civil Procedure 54(d)(1), costs should generally "be allowed to the prevailing party." This rule "creates a presumption that the district court will award costs to the prevailing party," requiring a "valid reason" if such costs are denied. *In re Williams Sec. Litig. – WCG Subclass*, 558 F.3d 1144, 1147 (10th Cir. 2009); *see also Jones v. Unisys Corp.*, 54 F.3d 624, 633 (10th Cir. 1995) (noting the "presumption favoring award of statutorily authorized costs").[7] Critical to the inquiry is whether ""the costs are for materials necessarily obtained for use in the case."" *Allison v. Bank One – Denver*, 289 F.3d 1223, 1248 (10th Cir. 2002) (quoting *U.S. Indus., Inc. v. Touche Ross & Co.*, 854 F.2d 1223, 1245 (10th Cir. 1988), *overruled on other grounds as recognized by Anixer v. Home-Stake Prod. Co.*, 77 F.3d 1215, 1231 (10th Cir. 1996)). "The 'necessarily obtained for use in the case' standard does not allow a prevailing party to recover costs for materials that merely 'added to the convenience of counsel' or the district court." *In re Williams Sec. Litig.*, 558 F.3d at 1147-48 (quoting *Touche Ross*, 854 F.2d at 1245). On the other hand, "materials may be taxable even if they are not 'strictly essential' to the district court's 'resolution of the case.'" *Id.* at 1148 (quoting *Furr v. AT&T Technologies, Inc.*, 824 F.2d 1537, 1550 (10th Cir. 1987)). In short, the question is whether the costs were *reasonably* necessary at the time they were incurred. *Id.* The prevailing party's proposed costs must be "given careful scrutiny," and that party bears the burden of showing the amount of costs and the

---

[7] James River does not argue that any of the *categories* of costs are barred by statute or somehow unrecoverable; rather, it attacks the specific costs as unreasonable.

reasonableness of that amount.  *Id.* at 1147-48.  However, "[o]nce a prevailing party establishes its right to recover allowable costs, . . . the burden shifts to the non-prevailing party to overcome the presumption that these costs will be taxed.  *Id.* at 1148 (quotations and citation omitted).

Rapid Funding seeks costs in a variety of categories, each of which the Court examines below.

      a.    *Daubert* Hearing Transcript

Rapid Funding requests $303.60 in costs for the court reporter's fee to prepare the transcript of the pre-trial *Daubert* hearing dealing with Mr. Miller's proffered expert testimony.  (Doc. # 236 at 4, 5.)  Rapid Funding's argument on this point is thin, urging simply that the hearing has been repeatedly referred to in this case.  But as discussed above, Mr. Miller's trial testimony on valuation – which was similar to his expert testimony discussed at the *Daubert* hearing – was a key component of Rapid Funding's case.  Although a close call, given the presumption that authorized costs should be awarded, the Court finds this transcript to have been reasonably necessary to permit Rapid Funding to prepare for and present its case.  These costs are awarded.

      b.    Trial Exhibits

Rapid Funding also seeks $4,186.80 in costs for copies of trial exhibits.  (Doc. # 236 at 4.)  Rapid Funding notes that these copies were referenced by counsel during trial and occasionally presented on the Court's ELMO system.  In light of the volumi-nous exhibits and the necessity of having access to those exhibits, the Court finds that

these costs were reasonably necessary.  Further, while the amount is substantial, the invoices submitted in support of Rapid Funding's bill of costs indicate that a large portion of the costs relate to printing color copies of certain exhibits.  (Doc. # 218-3 at 9).  In light of the importance of these exhibits to the presentation of Rapid Funding's case at trial, the Court finds the amount to be reasonable.  Rapid Funding is awarded its trial exhibit copying costs.

c.      Video Deposition Transcripts

Rapid Funding seeks a total of $6,435.63 in costs relating to video deposition transcripts: $6,216.75 for printing color deposition designations for video depositions played at trial (Doc. # 250 at 2)[8] and $218.88 for printing what appear to be excerpts of those same depositions (Doc. # 236 at 4, 5).  James River does not contest the reasonableness or necessity of the $218.88 for the black and white printing, and the Court agrees that those costs should be awarded.

The color copies are another matter.  Rapid Funding argues that the copies were for counsel's use "during the oral argument in Court regarding the video and anticipated oral argument at the Trial Preparation Conferences."  (Doc. # 250, ¶ 4; *see also* Doc. # 236 at 4 (noting "color deposition designations, for counsel's use").)  This is essentially an admission that the copies were for counsel's convenience.  Further, even if color copies of the designations were necessary, Rapid Funding has not adequately

---

[8]   In its initial motion, Rapid Funding sought $12,433.50 for the color transcripts. However, Rapid Funding was able to negotiate a discount with its vendor and now seeks this reduced amount.

explained why more than $6,000 was a reasonable amount to pay for transcripts that were simply used for reference during pre-trial argument. The Court declines to award the $6,216.75 for printing color deposition designations.

        d.    Witness Travel Fees

One of Rapid Funding's witnesses, Bob Rice, traveled from Wisconsin to Denver to testify at trial. (*See* Doc. # 236 at 6.) The Clerk awarded Rapid Funding $340.34 for Mr. Rice's travel and lodging costs. This award included $223.34 for hotel and meals, and $117 for travel; the travel cost was calculated by taking the statutory $0.585 per mile reimbursement rate and applying it to the 100-mile witness travel distance contemplated in the Federal Rules of Civil Procedure.[9] *See* Fed. R. Civ. P. 45(b)(3)(A)(ii). In reality, Mr. Rice incurred $865.45 in travel costs: $721.30 in airfare; $124.15 in cab expenses; and $20 in airport parking. (Doc. # 218-5 at 2.) Rapid Funding seeks to recover these full travel costs.[10] (Doc. # 250 at 3.)

James River concedes that the Court has discretion to award these full travel costs, but argues that the amount determined by the Clerk was reasonable and should be upheld. (Doc. # 238 at 5.) Specifically, James River challenges the airfare amount, arguing that it found tickets at half the cost on short notice. (*Id.* at 6.) In response,

---

[9]  Applying the statutory reimbursement rate to a travel distance of 100 miles each way (200 miles total) yields $117.

[10]  Rapid Funding seeks a total of $1,088.79, but acknowledges that the $340.34 already awarded by the Clerk must be deducted from that amount. (Doc. # 250 at 3.) Thus, to fully compensate Rapid Funding for Mr. Rice's fees, the Court would need to award an additional $748.45.

Rapid Funding notes that the witness did not fly first class, but rather the costs included a rescheduling fee necessitated by the Court's ruling on the order of witnesses. (Doc. # 250 at 3.) The Court finds that these travel expenses were both necessary and reasonable and awards an additional $748.45 to fully reimburse Mr. Rice's costs.

e.     KepOp Printing Charges

Rapid Funding claims $231.24 in printing costs to reproduce certain documents from the files of a company called ASU Group. (Doc. # 236 at 4, 6.) Rapid Funding argues that these ASU Group materials were necessary, as they were ultimately used at trial. (*Id.*) However, Rapid Funding admits that it is "unable to prove with certainty that this copy charge was for the reproduction of ASU Group's files," and instead simply notes that it received and produced the ASU documents "at about th[e] same time" as the printing bill. (Doc. # 250 at 3-4.) The Court finds that this is insufficient to meet Rapid Funding's burden to show the actual amount incurred and therefore declines to award these costs.

f.     Deposition Costs

Rapid Funding seeks $10,166.44 in costs relating to eight depositions. (Doc. # 236 at 4-5.) James River's primary objection to taxing these costs is that none of the depositions were actually used at trial. (Doc. # 238 at 7-8.) However, depositions need not actually be used at, or even designated for use at, trial in order for a party to recover their costs. *In re Williams Sec. Litig.*, 558 F.3d at 1149. What matters is that the materials "be 'reasonably necessary for use in' the case 'at the time the expenses

were incurred.'" *Id.* (quoting *Callicrate v. Farmland Indus., Inc.*, 139 F.3d 1336, 1340 (10th Cir. 1998)); *see also Callicrate*, 139 F.3d at 1340 ("[I]f materials are reasonably necessary for use in the case although not used at trial, the court is nonetheless empowered to find necessity and award costs."). Moreover, there is no per se bar to seeking, as Rapid Funding does, the costs of both videotaping and transcribing the deposition. The Tenth Circuit has approved recovery of both so long as each was reasonably necessary. *Tilton v. Capital Cities/ABC Inc.*, 115 F.3d 1471, 1477-78 (10th Cir. 1997). Indeed, "in most cases, a stenographic transcript of a videotaped deposition will be 'necessarily obtained for use in the case.'" *Id.* at 1778.

Four of the depositions were given by Rapid Funding witnesses – Andrew Miller (two depositions), J. Kent Miller, and Edward Reilly – who ultimately testified. Rapid Funding argues that the costs of reproducing their transcripts were reasonably necessary to allow these witnesses to prepare for trial. (Doc. # 250 at 5.) The Court agrees. Rapid Funding also seeks the cost of obtaining a copy of the videotape of these depositions. (*Id.* at 6.) Rapid Funding cursorily argues that the videos, too, were necessary to prepare the witnesses, but fails to explain why the written transcripts were inadequate for this purpose. As the videos appear to have been merely for the convenience of counsel, the Court declines to award video costs. The Court awards a total of $1,981.68 – the cost of the depositions minus the video fees – for these four depositions.

Rapid Funding also seeks the costs for depositions of two James River employees, Ann Marie Marson and Matthew Baker. Rapid Funding claims that, at the time these depositions were taken, it anticipated either using the videos in lieu of live testimony or, if the witnesses testified live, using them for impeachment. (Doc. # 250 at 6.) Video impeachment is a reasonable litigation strategy and cannot be considered simply for counsel's convenience. *Cf. Tilton*, 115 F.3d at 1477 ("'Videotaped depositions are a necessary and time effective method of preserving witnesses' time and allocating precious court and judicial time in this age of advanced court technology and over-crowded court calendars.'" (quoting *Commercial Credit Equip. Corp. v. Stamps*, 920 F.2d 1361, 1368 (7th Cir. 1990))). Moreover, there are legitimate reasons to also prepare a written transcript, such as to guard against technical difficulty with the video deposition, to prepare objections, and to construct an appellate record. *See id.* at 1478. Although the video depositions ultimately were not used, the Court finds that the costs were reasonable and necessary at the time they were incurred. The Court awards $5,636 for the transcript and video costs of these depositions.

Finally, Rapid Funding seeks the deposition costs for two of James River's expert witnesses, John Meyer and Peter Evans. (Doc. # 236 at 5.) Again, Rapid Funding argues that it intended to use the videotapes to impeach the experts, if necessary, at trial. For the same reasons discussed with respect to Ms. Marson and Mr. Baker, the Court finds these costs reasonably necessary and thus awards $2,293.76.

g.      Video Deposition Preparation

The last category of costs sought by Rapid Funding are costs related to the preparation of video depositions for use at trial.  (Doc. # 236 at 5, 6.)  James River objects to these costs because "[t]he testimony could have been read to the jury rather than presented by video."  (Doc. # 238 at 9.)  However, as the Tenth Circuit noted in *Tilton*, "[w]e see no reason to penalize a prevailing party because the party has chosen to preserve and present testimony through a videotape instead of a printed transcript." 115 F.3d at 1477.  Rapid Funding is awarded $15,950 to cover these costs.[11]

h.      Summary

Rapid Funding is awarded the following costs, in addition to those costs already taxed by the Clerk, as the prevailing party in this litigation:

| | |
|---|---|
| *Daubert* Hearing Transcript: | $303.60 |
| Trial Exhibits: | $4,186.80 |
| Deposition Excerpts: | $218.88 |
| Witness Costs: | $748.45 |
| Deposition Costs: | $9,911.44 |
| Video Editing Costs: | $15,950 |
| **Total:** | **$31,319.17** |

---

[11]   Rapid Funding initially sought $16,825, but was able to negotiate a reduction with its vendor.  (Doc. # 250 at 8.)

### III. **CONCLUSION**

For the foregoing reasons, it is ORDERED as follows:

1.      James River's Motion for a New Trial (Doc. # 220) is DENIED;

2.      James River's Motion for a Remittitur (Doc. # 221) is DENIED;

3.      James River's Renewed Motion for Judgment as a Matter of Law (Doc. # 222) is DENIED;

4.      Rapid Funding's Motion to Increase Exemplary Damage Award or in the Alternative Award Double Damages and Attorney's Fees (Doc. # 216) is DENIED;

5.      Rapid Funding's Motion for Award of Prejudgment Interest (Doc. # 217) is GRANTED in part and DENIED in part.  Rapid Funding is awarded prejudgment interest, but only in the amount of $481,446.58;

6.      Rapid Funding's Motion for Review of Taxation of Costs (Doc. # 236) is GRANTED in part and DENIED in part.  Rapid Funding is awarded $31,319.17 in costs, as outlined above; and

7.      James River's Request for Oral Argument on its Motion for New Trial and Motion for Remittitur (Doc. # 253) is DENIED.

DATED:  March __16__, 2010

BY THE COURT:

_____
CHRISTINE M. ARGUELLO
United States District Judge